IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RANDALL B. OBRYK, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | No. 15 C 9895 |
| | ) | |
| NANCY A. BERRYHILL, ACTING | ) | Hon. Judge Virginia M. Kendall |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Randall B. Obryk's complaint seeking review of the denial of disability benefits by the Commissioner of Social Security ("the Commissioner") for the period between June 1, 2009, and November 22, 2014.  (Dkt. No. 1.)  The Commissioner concluded that the Administrative Law Judge ("ALJ") was correct that the Plaintiff was not disabled at any time, followed by the Appeals Council's decision that the Plaintiff was, in fact, disabled as of November 22, 2014.  The Social Security Administration ("SSA") filed a motion for summary judgment asking the Court to affirm the decision of the Commissioner.  (Dkt. No. 18.)  The Court hereby reverses the SSA decision, remanding for further proceedings consistent with this opinion, and denies the motion for summary judgment.  [1; 18.]

## BACKGROUND

### I. Obryk's Health and Initial Disability Application

#### A. Before Obryk's September 2012 Disability Application

Randall B. Obryk ("Obryk") just turned 59 years old. Before he experienced the health issues and subsequent disability at question in this case, he began working as a maintenance technician in 1982 for various colleges and apartment buildings after obtaining some high school

education.  (Dkt. No. 12-1 at 39-40.)[1]  He continued to work as a maintenance technician through September 2007 with duties that included electrical repairs, plumbing, heating, ventilation, and air conditioning ("HVAC") tasks.  (*Id*. at 40-41.)  These jobs were physically demanding, requiring him to be on his feet most of the time, occasionally to lift about 50 pounds, and to use various tools that applied pressure and torque.  (*Id.* at 40-42.)

On April 14, 2005, things took a turn when Hinsdale Hospital admitted Obryk because he had trouble breathing.  (*Id.* at 229.)  He underwent surgery in 2006 to replace a part of his aorta with a mechanical valve.  (*Id.* at 45-46.)  After Obryk's surgery, he went back to work, but his health problems kept him from fully performing.  (*Id.* at 57.)  For instance, Obryk testified he experienced muscle pain, heart pain, weakness, and fatigue.  (*Id.*)  He also experienced problems with heavy lifting and not completing tasks in the allotted amount of time.  (*Id.* at 58-59.)

In addition to his cardiac problems, Obryk also suffers from depression. Obryk stated that he has always dealt with depression, but his depression worsened starting in 2002.  (*Id.* at 266.)  That year, Obryk's apartment caught on fire and he moved into his parent's house.  (*Id.*)  His mom fell ill shortly thereafter in 2003 and ultimately died of a blood infection.  (*Id.*)  His good friend died in 2006, his dog died in 2007, and his father died in 2009.  (*Id.*)  According to Obryk, each of these developments worsened his depression.  (*Id.*)  Obryk also attributed some of his depression to the two major operations he had.[2]  (*Id.*)  When Obryk experiences depression, he loses energy, feels fatigued, and experiences dizzy spells.  (*Id.*)  He also gets easily angered and has a hard time communicating with people.  (*Id.*)

Obryk alleges an onset date for his disability of June 1, 2009, which is the date he became unable to work due to cardiac and depression.  (*Id.* at 5-6; 100.)  Obryk stated that he

---

[1] Docket Number 12-1 is the Administrative Record.
[2] Obryk had open-heart surgery to replace part of his aorta with a mechanical valve. He also had a surgical procedure to treat a 90 percent clotted carotid artery.  (Dkt No. 12-1 at 46.)

needed to leave his job on that date because he got a new supervisor who did not understand his limitations, including not being able to work for long periods of time and only being able to walk for about 20 minutes before he has to sit and take a 10 minute break. (*Id.* at 44; 48.) Since he quit his job, Obryk has had no sources of income aside from his Supplemental Security Income ("SSI") benefits. (Dkt. No. 1 at 9.) He mainly uses his savings and a small inheritance that he received to support himself. (Dkt. No. 12-1 at 52.)

Since his surgery, Obryk has been able to maintain his household, which includes washing dishes, vacuuming, sweeping, dusting, doing laundry, and preparing frozen dinners. (*Id.* at 53-54.) He grocery shops, but only when someone can give him a ride and help him carry his packages into the house. (*Id.*) He cares for his small dog, which includes feeding it, giving it water, and taking it for walks, even though he cannot walk more than a couple of blocks and has trouble walking uphill and downhill. (*Id.* at 54.) Obryk also administered his father's estate, which the record describes as primarily selling his father's house. (*Id.* at 24.)

From September 24, 2009, through January 3, 2013, Obryk was under the general care of Dr. Michael Brooks ("Brooks"), Doctor of Osteopathic Medicine ("D.O."). (*Id.* at 229.) During this time, Brooks followed Obryk's conditions of hypercholesterolemia,[3] hypertension, and depression. (*Id.* at 238.) When Brooks first saw Obryk on September 24, 2009, Brooks noted that Obryk needed to get blood work done. (*Id.* at 229.) Even though he had no insurance at the time, Obryk stated that he understood the need to get the blood work done and that he was willing to comply. (*Id.* at 229; 237.)

From November 16, 2009, through March 18, 2013, Dr. Duane Follman ("Follman"), Doctor of Medicine ("M.D.") followed Obryk's cardiac problems. (*Id.* at 229.) On November

---

[3] Hypercholesterolemia is "a condition characterized by very high levels of cholesterol in the blood." See *Your Guide to Understanding Genetic Conditions*, Genetic Home Reference, June 13, 2017, (available at https://ghr.nlm.nih.gov/condition/hypercholesterolemia#synonyms).

16, 2009, Follman conducted a cardiology consultation of Obryk and reported that Obryk's conditions of cardiomyopathy[4] and hypertension remained stable and that his hypercholesterolemia was well controlled on medical therapy. (*Id.*) Follman also noted that Obryk was aware of his surroundings and his mood was appropriate. (*Id.* at 246.)

When Obryk visited Brooks, his general care doctor, again on December 9, 2010, Brooks noted that Obryk did not comply in the preventative health care measures, including refusing to do a colonoscopy and refusing to stop smoking cigars. (*Id.* at 240.) Brooks told Obryk that failure to follow those recommendations could result in an increased risk of illness or death. (*Id.* at 240.)

Obryk then had another cardiology consultation with Follman on February 8, 2011, in which there were no cardiac complaints, no chest pain, nor any shortness of breath. (*Id.* at 229; 247.) Follman noted that Obryk could not afford a Doppler echocardiogram ("echo exam")[5] at that time and that Obryk's hypertension was well controlled on medical therapy. (*Id.*) Obryk's valve sounds were excellent during this visit. (*Id.* at 248.)

Obryk's next visit with Follman was on February 20, 2012. Follman noted that Obryk's cardiomyopathy improved and his hypertension and status post valve replacements remained stable. (*Id.* at 250.) Obryk's mood was appropriate and he was aware of his surroundings. (*Id.*)

B. Obryk's 2013 Examinations

Obryk filed a Title II application for a Period of Disability and Disability Insurance Benefits on September 26, 2012. (*Id.* at 16.) In making its determination regarding Obryk's

---

[4] Cardiomyopathy is "a condition where the heart muscle is abnormal." It can lead to heart failure. See *Diseases and Conditions*, Mayo Clinic, March 17, 2015, (available at http://www.mayoclinic.org/diseases-conditions/cardiomyopathy/basics/definition/con-20026819).

[5] A Doppler echocardiogram "test is used to look at how blood flows through the heart chambers, heart valves, and blood vessels. See *Echocardiogram Home*, WebMD, August 7, 2015, (available at http://www.webmd.com/heart-disease/echocardiogram#1).

disability status, the Agency had doctors conduct exams of Obryk on its behalf. On January 21, 2013, Dr. Pranjal Shah, ("Shah") M.D. conducted an internal medicine consultative exam of Obryk on behalf of Disability Determination Services ("DDS"). At this time, Obryk raised that he suffered: (1) depression for the past five to six years; (2) lethargy and dizziness; (3) heart palpitations; (5) shortness of breath; and (6) pain in the bottom of the left foot, which goes away on its own. (*Id.* at 230.) Shah spent thirty minutes doing a comprehensive history and physical exam for Obryk. (*Id.* at 259.) Shah noted that Obryk was alert and appeared to have normal memory. (*Id.* at 260.) However, Obryk did not appear to relate with Shah during the examination. (*Id.*)

On February 22, 2013, Dr. Kelly Renzi ("Renzi"), Doctor of Psychology ("Psy. D.") conducted a psychological examination of Obryk on behalf of DDS. Obryk told Renzi that he used to drink heavily but had abstained from doing so from 2003-2009. (*Id.* at 267.) At this time, Obryk was taking part in court-mandated alcohol treatment and had abstained for two months. (*Id.*) Renzi also noted that Obryk's cardiology records from the last four years do not show any ongoing cardiac problems. (*Id.* at 268.) Obryk's mood appeared mildly anxious, but he was "generally cooperative and appropriate with the evaluation." (*Id.* at 269.) Renzi ultimately concluded that he met the criteria for mild depressive disorder and alcohol abuse. (*Id.* at 269.)

Obryk's final cardiology consultation with Follman was on March 18, 2013. (*Id.* at 230.) Obryk had no cardiac complaints during this consultation. (*Id.* at 231.) He generally felt depressed, but functional, and he was taking metoprolol,[6] but only in the evenings. (*Id.*)

---

[6] Metoprolol is "a beta-blocker used to treat chest pain, heart failure, and high blood pressure." See *Metoprolol Succinate Oral*, WebMD, 2017, (available at http://www.webmd.com/drugs/2/drug-8814/metoprolol-succinate-oral/details).

On June 24, 2013, Obryk saw Brooks for a follow up visit, and Brooks noted that Obryk presented signs of "anxious/fearful thoughts, depressed mood, diminished interest or pleasure, fatigue, feelings of guilt and panic attacks but denies sleep disturbances or thoughts of death or suicide." (*Id.* at 304.) Obryk's risk factors included financial worries, which prevented him from being able to seek psychiatric help. (*Id.*) Brooks also noted "[Obryk's] depression [was] aggravated by conflict or stress but not with alcohol use or lack of sleep." (*Id.* at 304.) Obryk did not comply with Brook's recommended preventative health care measures, which included a colonoscopy and routine blood work. (*Id.* at 307.)

C. Obryk's 2014 Examinations and Suicide Attempt

Obryk lost his insurance[7] and had not been able to see a physician for many months before he got insurance and was able to visit Dr. Andrew Michael Dunn ("Dunn"), D.O. on April 8, 2014. (*Id.* at 302.) Dunn noted that Obryk presented problems with weakness and depression, which occur persistently. (*Id.* at 231.) Obryk's weakness only allows him to walk one to two blocks before resting. He also sleeps for about 12 hours each day. (*Id.*) Obryk's symptoms included "depressed mood, diminished interest or pleasure, fatigue, feelings of guilt, sluggishness and sleep disturbances." (*Id.*) Dunn noted that Obryk's weakness probably stemmed from either his depression or cardiovascular issue. (*Id.*) Obryk's risk factors included "death of a friend or loved one, financial worries, medication [], social isolation and unemployment." (*Id.* at 297.) His risk factors excluded "alcoholism, childhood abuse or neglect, substance abuse and relationship problems." (*Id.*) Dunn recommended therapy and a psychiatric

---

[7] The record does not reflect when Obryk lost his insurance. See Dkt. No.12-1 at 302.

appointment for Obryk and reported normal neurological and psychiatric examination findings with the exception of anhedonia.[8]  (*Id.* at 300.)

On May 17, 2014, Obryk attempted suicide and was admitted to the psychiatric unit of a hospital after an overdose of medications combined with alcohol.  (*Id.* at 232.) Obryk was observed closely and encouraged to participate in group activities.  (*Id.* at 310.) Once he started to show improvement in his mood, "[Obryk] was no longer considered a danger to himself or others."  (*Id.*)  Obryk was accordingly discharged on May 22, 2014.  (*Id.*)

As of August 24, 2014, Obryk was taking Warfarin, Norvasc, Metoprolol, and Zoloft, which were all prescribed for his depression.  (*Id.*)

## II.     Procedural History

### A.   Commissioner of Social Security Administration Denies Obryk's Initial Disability Claims

The Commissioner of the Social Security Administration looks to the Agency's disability rules when making a disability determination. (*Id.* at 96.)   The Agency's disability rules to qualify for worker's Social Security benefits are as follows:

> The Disability Rules
> You must have the required work credits and your health problems must:
> keep you from doing any kind of substantial work (described below), and last, or
> be expected to last for at least 12 months in a row, or result in death.
>
> Information About Substantial Work
> Generally, substantial work is physical or mental work a person is paid to do. Work can be substantial even if it is part-time. To decide if a person's work is substantial we consider the nature of the job duties, the skills and experience needed to do the job, and how much the person actually earns.
> Usually, we find that work is substantial if gross earnings average over $1010 per month after we deduct allowable amounts.

---

[8] Anhedonia is "the loss of the capacity to experience pleasure." See *Medical Definition of Anhedonia*, MedicineNet, May 13, 2016, (available at http://www.medicinenet.com/script/main/art.asp?articlekey=17900).

A person's work may be different than before his/her health problems began. It may not be as hard to do and the pay may be less. However, we may still find that the work is substantial under our rules.

(*Id.*) Based on the evaluations of Obryk's health problems by doctors and trained staff, the Commissioner denied Obryk's claim on March 7, 2013, finding that his health problems did not rise to the level of disability under the Agency's rules because Obryk's health problems did not keep him from doing substantial work. (*Id.*) The Agency's explanation of its determination noted that: "The medical evidence in file shows that [Obryk's] condition did cause some restrictions in his ability to function. However, [he] still had that ability to do light work." (*Id.* at 100.) The determination report went on to say: "[The Agency] realize[d] that [Obryk's] condition prevented him from doing [his] past job, but [he] was still able to do other types of work which are less demanding . . ." (*Id.*)

B. Administrative Law Judge ("ALJ") Denies Obryk's Claim at Hearing

Obryk filed a written request for a disability hearing on September 23, 2013. (*Id.*) Before the hearing took place on August 25, 2014, Obryk filed an additional application for supplemental security income ("SSI") on May 2, 2014. (*Id.* at 16.)

To determine whether a claimant is disabled and thus eligible for either disability insurance benefits or supplemental security income, an ALJ uses a sequential five-step inquiry. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The inquiry asks: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Kastner* at 646.

Here, the ALJ found that Obryk had not engaged in substantial gainful employment since June 1, 2009, and had the severe impairments of aortic aneurysm, status post aortic valve repair, and depression, thereby satisfying the first two steps. (Dkt. No. 12-1 at 18.) Although the ALJ noted these severe impairments, he determined that the conditions did not meet the requirements for presumptive disability at step three and therefore moved on to step four—the assessment of Obryk's residual functional capacity ("RFC"). (*Id.* at 19.) The ALJ determined that Obryk has the "[RFC] to perform light work . . . limit[ing] [] the work to simple, routine and repetitive work performed in a work environment free of fast paced productions requirements that involve only simple, work-related decisions; and with few, if any, work place changes." (*Id.* at 21.) Finally, at step five, the ALJ determined that Obryk is unable to perform any of his past relevant work. (*Id.* at 24.)

The ALJ's decision finding Obryk not disabled heavily relied on the vocational expert's ("VE") testimony at Obryk's hearing. Based on the ALJ's questioning, the VE concluded that a person with abilities similar to Obryk was capable of working positions limited to simple, routine, repetitive tasks, in a non-fast-paced environment, involving only simple work-related decisions, and that those positions were available in the State of Illinois. (*Id.* 67-68.) Obryk's attorney also examined the VE. His attorney's line of questioning limited the hypothetical individual based more on the need for routine breaks due to fatigue as well as limitations on human interaction because of depression. (*Id.* 68-70.) Although the VE admitted that these limitations would narrow the availability of positions for someone with symptoms similar to Obryk's, they did not preclude the VE from stating that positions were still available in the economy. (*Id.*)

In spite of finding that Obryk had not engaged in substantial activities since 2009 when he first began to suffer from his conditions, the ALJ still determined that there were jobs, available in Illinois, that he could perform. (*Id*. 18-26.) As for his assessment of impairments, the ALJ held that Obryk suffered from aortic aneurysm, status post aortic valve repair, and depression. (*Id*.) In spite of these ailments, the ALJ concluded that Obryk has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except work is limited to simple, routine and repetitive, performed in a work environment free of fast paced productions requirements that involve only simple, work-related decisions; and with few, if any, work place changes. (*Id*.) Based on these findings, the ALJ concluded that Obryk was not disabled from June 1, 2009 through December 12, 2014.

### C. Appeals Council Grants in Part and Denies in Part Obryk's Appeal

The Plaintiff asked the Appeals Council to review the ALJ's decision, and his request for review was granted on August 17, 2015. (*Id.* at 5.) The Appeals Council adopted the ALJ's findings and conclusions at all steps of the sequential evaluation process (see above), but disagreed as to Obryk's age category. (*Id*.) The Council noted a change to Obryk's age category as a result of his turning 55 on November 21, 2014. (*Id*. at 6.) Based on this change in age category, the Council concluded that Obryk was, in fact, disabled at all times after November 21, 2014 – the date that he turned 55 years of age. (*Id*. at 7.) The Council based this conclusion on Obryk's application for supplemental security income filed on May 2, 2014, under § 1614(a)(3)(A) of the Social Security Act. (*Id*. at 7-8.)

On November 12, 2015, Obryk filed a complaint for this Court to review the decision of the Appeals Council. (Dkt. No. 1 at 1.) He only "appeals from the portion of the decision which found him not eligible for Social Security Disability benefits prior to November 22, 2014. (*Id.* at

2.) Defendant has moved for summary judgment, arguing that the ALJ conducted a proper evaluation of Obryk's credibility.

## STANDARD OF REVIEW

The Commissioner's decision to adopt any portion of the ALJ's factual findings is conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Therefore, we will reverse the [ALJ]'s findings only if they are not supported by substantial evidence or if the [ALJ] applied an erroneous legal standard." *Rohand v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing for substantial evidence, the Court reviews the entire administrative record, but shall not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [the Court's] own judgment for that of the Commissioner. *Clifford v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000). While avoiding a judicial re-weighing of the evidence or substitution of the ALJ's judgment, the Court will "examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow [the Court] to assess the validity of the agency's ultimate findings..." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) (emphasis added).

The Court reviews all claims in order to determine whether the decision of the ALJ should be affirmed, reversed, or modified. 42 U.S.C. §405(g); *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). A determination that there exist outstanding factual issues as to whether the claimant is disabled requires the Court to remand the matter to the SSA for further review. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## DISCUSSION

The Parties dispute four issues arising out of the Commissioner's adoption of the ALJ's "findings and conclusions at all steps of the sequential evaluation process" for the period of time prior to November 22, 2014. The issues are: (1) whether the ALJ failed to accommodate the Plaintiff's "moderate limitations" in concentration, persistence, or pace; (2) whether the record is lacking and therefore unsupportive of the ALJ's findings as to the Plaintiff's Residual Functional Capacity ("RFC"); (3) whether the ALJ's RFC assessment is contrary to Social Security Ruling ("SSR") 96-8P; and, (4) whether the ALJ made improper credibility or symptom evaluation determinations. The Court review each to determine whether the record contains substantial evidence in support of the Agency decision denying the Plaintiff of disability status prior to November 22, 2014.

I.      **The Residual Functional Capacity Assessment**

A claimant's RFC is established in order to determine whether the claimant can perform the duties of their prior work position, or alternatively whether the claimant is capable of doing any other work that exists in the economy. See 20 C.F.R. § 404.1545. The RFC is coupled with other vocational experience to determine a person's functional ability to work, either in their prior job, or in other available jobs with similar requirements, and is one way the SSA establishes whether the individual is disabled. See 20 C.F.R. § 404.1520(a). One factor that aids the ALJ in determining a person's RFC is mental capacity. *Id*. As part of making this determination, the ALJ must consider all of the claimant's impairments, including those that are not severe. *Id*. at (e); 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945; SSR 96-8p, WL 374184 (S.S.A.), *5 (June 10, 1997). The ALJ is also required to incorporate all of the claimant's limitations supported by the medical record. See SSR 96-5p, WL 374183 (S.S.A.), *5 (July 2, 1996) (an RFC assessment "is based upon consideration of all medical evidence and all relevant

12

nonmedical evidence").  As this relates to the Agency review process, the need for defining the Plaintiff's RFC is so that the ALJ can appropriately determine whether he can no longer perform his former job (step four of the assessment); and whether he is capable of performing other jobs that are less demanding despite the Plaintiff's physical, mental, and vocational limitations (step five of the assessment).  See, e.g., *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (brief summary of the purpose of each step in the assessment inquiry).

II.     **The ALJ's Failure to Accommodate for Limitations in Concentration, Persistence, or Pace**

The Plaintiff first argues that the ALJ failed to build a "logical bridge" between evidence regarding his mental limitations in concentration, persistence, or pace, and how those limitations impacted the ALJ's assessment of the Plaintiff's work restrictions.  (Dkt. No. 14 at 6-8.)  The Plaintiff also suggests, in part, that this was the result of the ALJ's failure to incorporate these specific mental limitations in the hypothetical questions posted to the VE during the vocational hearing.  (*Id*. at 9.)  The Commissioner argues that the ALJ's decision in the area of the Plaintiff's RFC is deferential, and that the ALJ properly factored the Plaintiff's moderate difficulties into the ultimate conclusion that the Plaintiff was not disabled by these mental limitations.  (Dkt. No. 19 at 3-8.)

In applying the RFC assessment process described above to the facts here - it is clear that the ALJ failed to construct a "logical bridge" between the evidence in the record of the Plaintiff's mental limitations and the conclusion that the Plaintiff was not disabled.  The ALJ determined that the Plaintiff had moderate difficulties in concentration, persistence, or pace.  (Dkt. No. 12-1, at 20.)  Further, the ALJ stated that he "accounted for the claimant's moderate difficulties in his residual functional capacity as related to any allegations regarding the effects of the claimant's

fatigue and his allegations that things take longer for him to do." (*Id*. at 20.) After noting the

Plaintiff's mental limitation, the ALJ concluded that he has,

> "the residual functional capacity to perform light work ... except work is limited
> to simple, routine and repetitive, performed in a work environment free of fast
> paced productions requirements that involve only simple, work-related decisions;
> and with few, if any, work place changes."

(*Id*. at 21.) The determination that the Plaintiff suffers from moderate mental limitations must be

incorporated into the RFC assessment as well as in the hypothetical questions posed to the VE.

See *O'Connor-Spinner*, 627 F.3d at 619 (a VE must consider deficiencies of concentration,

persistence and pace); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) ("both the hypothetical

posted to the VE and the ALJ's RFC assessment must incorporate all of the claimant's

limitations supported by the medical record"). Here, although the ALJ acknowledged Plaintiff's

depression in the RFC assessment, (Dkt. No. 12-1 at 23-24), he relied heavily on the Plaintiff's

testimony to conclude that the "Plaintiff's depression does not preclude him from work-related

activities." (*Id*. at 24.) In spite of medical evidence in the record reflecting that Plaintiff's

symptoms that coincide with his depression included lethargy, bouts of dizziness, decreased

energy, mood disturbance, fatigue, and persistent weakness. (*Id*. at 266-69; 272-75; 297; 304;

310-11; 313-30.) It is relevant here, for timing purposes as to the onset of depression, to recall

the Plaintiff's citation of a litany of reasons for his depression including the deaths of his mother,

father and dog, his two heart-related surgeries, and his suicide attempt – all of which occurred

prior to November 22, 2014. (*Id*. at 266-68; 297; 299; 310.) While the credibility and symptom

evaluation issues are addressed in a later portion of this opinion, it is notable here that the ALJ

does not go into detail as to how the Plaintiff's depression influenced his moderate mental

difficulties, which potentially slow his pace and cause him to take longer to perform basic mental

skills. It is precisely the absence of a logical bridge which enabled the ALJ to isolate Claimant's

personal evaluation of his ability from the other pieces of evidence in the record including his very limited education, his documented depression, documented heart condition, documented limitations and the triggers that led to his suicide attempt. The ALJ failed to incorporate the Plaintiff's moderate difficulties in concentration, persistence, or pace, into the hypothetical questions posted to the VE, which is required. See *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (where they are identified, the VE must consider limitations in concentration, persistence, or pace); see also *Steward v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("an ALJ must articulate in a rational manner the reasons for his assessment of a claimant's residual functional capacity); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (the ALJ must connect the evidence to the conclusion through an accurate and logical bridge) (internal quotations omitted). As detailed above, the hypothetical assumes an individual who "will be limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production environments, involve only simply work-related decisions and few if any workplace changes." (Dkt. No. 12-1 at 67.) This hypothetical fails to square the Plaintiff's moderate difficulties with the kind of jobs requiring repetitive tasks, or that involve any kind of work-related decisions. These discrepancies between the medical reports, dating back prior to 2014, the general conclusion that the ALJ "accounted for moderate difficulties," and the failure to accommodate for the mental limitations in the hypotheticals posed by the VE are enough to indicate a lack of substantial evidence in the findings. Remand is required so as to build a better bridge between the facts, as they exist in the record, and the findings by the ALJ. See, e.g., *Parker v. Astrue*, 597 F.3d 920, 924-25 (7th Cir. 2010) (inconsistent findings by the ALJ require remand).

III.     **The ALJ's Failures Regarding the Functional Capacity Assessment and Findings**

Next, the Plaintiff makes two separate arguments regarding the ALJ's Functional Capacity Assessment and Findings: (1) the RFC finding lacked any medical opinion specifically addressing the Plaintiff's medical limitations; and, (2) the RFC assessment failed to consider "limitations and restrictions imposed by all of the [Plaintiff]'s impairments, even those that are not 'severe.'" The Court considers both of these issues in conjunction with each other and finds that remand is necessary based on the failures of the ALJ during the RFC assessment and implementation.

An ALJ's failure to explain the basis of his or her decision with record evidence requires reversal. See *Brisco ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (reversing an RFC determination for failure to adequately support the findings); *Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016) (reversing the ALJ decision for failure to set forth evidence supporting the finding that the claimant could perform simple light work as a "fatal error" in the process. As previously noted, an individual's RFC requires discussion of specific limitations and restrictions, even those that are not 'severe,' at the steps four and five of the assessment process. See SSR 96-8p, WL 374184 (S.S.A.), *7 (June 10, 1997); *Outlaw v. Astrue*, 412 Fed.Appx. 894, 897 (7th Cir. 2011) (upholding an ALJ's decision where the conclusion tracked reports from the agency psychologist and that included testimony of the claimant).

A.  The Mental Evaluation in the Functional Capacity Assessment

In making this finding, the ALJ concluded that this determination derives partially from the ALJ's conclusion that the RFC assessment accounts "for the claimant's moderate difficulties in his residual functional capacity" related to fatigue.  (*Id*.)  The evidence regarding a mental illness, if in the form of an expert opinion, must be from a mental health professional and not the opinion of the ALJ making his or her own medical assessment.  *Wilder v. Chater*, 64 F.3d 335,

337 (7th Cir. 1995) (health professionals, particularly psychiatrists, are the experts on issues of mental illness, not judges or lawyers); *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014) (playing doctor is not what an ALJ should be doing); *Voight v. Colvin*, 781 F.3d 871, 875 (7th Cir. 2015) (an ALJ is required to report accurate information as presented by the medical experts). Instead, the ALJ simply stated that he considered the Plaintiff's moderate difficulties related to fatigue within the assessment. (Dkt. No. 12-1 at 20.) Additionally, the ALJ's findings state, "a[s] such, I find that the claimant's depression does not preclude him from work-related activities." (*Id.* at 24.) Independent medical assessments are routinely remanded for expansion of the ALJ's reasoning. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (failure by the ALJ to submit a medical report to "medical scrutiny"). The ALJ claims to "have included the mental limitations within the residual functional capacity based on records received after the DDS opinion." (Dkt. No. 12-1 at 24.) However, the ALJ's inclusion of the mental limitations within the RFC, without further explanation or citation to an opinion of medical experts, as to the source of those mental limitations and their impact on the findings is more akin to an independent medical determination. Even assuming that the ALJ's findings are supported by the DDS opinion, the ALJ gives no later consideration to evidence in the record such as the Plaintiff's hospital visit for suicide in 2014 - other than to mention the Plaintiff's admission for medical treatment and subsequent release. Without obtaining any mental health professional's opinion of Plaintiff's functional ability and without explaining how he assessed the records for suicide attempt, recent hospitalizations and his long-term depression, his conclusion is not substantially supported.

B. The Explanation of the Findings in the Functional Capacity Assessment

The ALJ determined that the Plaintiff's RFC, when coupled with other factors such as age, education, and work experience, permitted him to work positions that are available in the economy, and so the Plaintiff was not disabled.  (*Id*. at 26.)  Part of the ALJ's findings included that the Plaintiff is capable of performing work limited to simple, routine and repetitive work involving only simple work-related decisions.  (*Id*. at 20.)  The ALJ's broad assessment requires further discussion of the specific limitations and restrictions – for example, the Plaintiff's fatigue and weakness.  (*Id*. at 77-78; 89-90; 60-61; 49-50; 302.) The assessment also requires further discussion as to what evidence in the record supports the conclusion that these limitations do not prohibit an individual's ability to perform light work.  Finally, it requires discussion of these limitations of the Plaintiff's mental limitations as made by a medical expert, and not simply by the ALJ.  See *Wilder*, 64 F.3d at 337; cf., *Outlaw* 412 Fed.Appx.at 897.  These limitations require further narrative discussion and an appropriate bridge between the evidence in the record and the ALJ's conclusion as to how they do not impact the requirements for light work.

**IV.      Failures in Symptom Evaluation**

Finally, the Plaintiff argues that the ALJ erred by making certain credibility or symptom evaluations that are contrary to Agency regulations as interpreted by Social Security Rulings ("SSR"s), and that these errors require additional evaluation by the Agency.  (Dkt. No. 14 at13-15.)  The Commissioner maintains that the ALJ's credibility determinations of the Plaintiff, which favored the conclusion that the Plaintiff was not disabled, were appropriate and well within the standards established by the Agency.  (Dkt. No. 19 at 10-13.)  The Court agrees with the Plaintiff.

As a preliminary matter, the Court will only overturn a credibility finding if it is "patently wrong."  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).   An ALJ's particular

credibility findings must be supported "by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). The Court's standard of review of a credibility determination is extremely deferential, unless the Court can rest its conclusion on objective factors that can be reliably reviewed. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). These evaluation requirements stem from 20 CFR § 404.1529, as well as Social Security Ruling 96-7p, which was the policy ruling in effect at the time of this Agency decision. The SSR supports the requirements set out in the regulation that state the existence of a physical or mental impairment, or the determination that a claimant is disabled, cannot be based solely on the claimant's description of symptoms. See SSR 96-7p, WL 374186 (S.S.A.), *2-3 (July 2, 1996). These symptoms assessments are used by the ALJ in conjunction with credibility determinations to assist in making a finding on the existence, or non-existence of a physical or mental impairment rising to the level of a disability. *Id*. In making this credibility determination, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment, but only if the ALJ also explores the reasons for a claimant's inability to explain the failure or infrequency of treatment as well. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

Here, the ALJ determined that the Plaintiff's statements were "not entirely credible," but why? For one, the ALJ notes that the Plaintiff did not actively seek more aggressive treatment for his depression. (Dkt. No. 12-1 at 24.) But this finding – that the Plaintiff is not credible with respect to describing symptoms of depression because he is not actively seeking additional treatment – fails to consider objectively reliable evidence in the record that explains away the

Plaintiff's inability to seek additional treatment, namely financial hardship. *Id*. at 51; 64; 236; 248; 272; 302-03; 307.

Next, the ALJ identified a series of improvements in the Plaintiff's symptoms – the result of increased medications from a psychiatrist, and also from speaking about his depression with a spiritual advisor a few times per week - as information conflicting with the Plaintiff's credibility. (*Id*. at 24.) However, what matters are not improvements in one's conditions, but instead whether the Plaintiff has improved enough "to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 810 (7th Cir. 2010). The ALJ does not adequately consider all of the evidence in the record in making the determination that Plaintiff is not disabled. For example, while not re-weighing the evidence, the Court notes that these improvements were reported in the same portion of the ALJ's findings that discuss a suicide attempt in 2014. The Court also does not believe that the ALJ's evidentiary findings support the conclusion that some improvements in the Plaintiff's conditions relate to his lack of credibility, or the ALJ's personal belief that he capable of light work activities despite his depression. (Dkt. No. 12-1 at 24.) See, e.g., *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (reversal required where the evidence is lacking a logical bridge).

Finally, the ALJ argues that the Plaintiff's credibility is undermined because the Plaintiff "was performing a significant amount of activities throughout the day, which was inconsistent [with] having significant limitations in concentration." (Dkt. No. 12-1 at 24.) The activities include household chores and care for his dog. (*Id*.) But these kinds of activities are routinely held to be inappropriate as activities that should form the basis of an ALJ's opinion about whether a claimant is disabled or not. See, e.g., *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("the critical differences between activities of daily living and activities in a full-time job

are that a person has more flexibility in scheduling the former than the latter, can get help from other persons … and is not held to a minimum standard of performance, as she would be by an employer).  Furthermore, the ALJ does not explain how these activities are inconsistent with the Plaintiff's ability to carry out certain work-related functions, and also how these daily functions contradict the Plaintiff's claims of particular symptoms.  See, e.g., *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (the ALJ must do more than simply identify daily activities in order to establish that a claimant is not disabled because of the routine household activities that they are capable of doing).

The Court is aware that the Plaintiff supports his argument that the ALJ made improper "credibility" findings with a Social Security Ruling that is no longer effective, and also that there is no longer a "credibility" determination required.  See SSR 16-3p, WL 1237954 (S.S.A.) (March 24, 2016) (superseding SSR 96-7p as of March 24, 2016).  But the new ruling merely removes the term "credibility" because that term is not used in the Agency regulations.  See 20 CFR § 404.1529 (discussing how to evaluate symptoms, including pain, including those symptoms submitted by the claimant).  If anything, SSR 16-3p simply requires the ALJ to evaluate an individual's alleged symptoms along with the medical evidence in order support a determination that the claimant is or is not disabled.  In short, the SSRs do not contradict each other with respect to what is required during the Agency assessment of the Plaintiff's disability status.

Where the ALJ bases his symptom evaluation on a variety of considerations that are mistaken, the Court will remand for further assessment.  *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  Here, the credibility or symptom-based assessment comes from three areas that lack support or were not properly analyzed in the ALJ's decision – the Plaintiff's "failure" to

further his treatment for depression, the "improvement" of his symptoms, and his ability to conduct daily activities around his household.  This combination of errors makes the ALJ's determination "patently wrong."  All of the ALJ's factual assertions are lacking the necessary support to build a logical bridge between the findings that the Plaintiff's symptoms do not reach the level of a permanent disability and the evidence in the record.

## CONCLUSION

Based on the foregoing, the Court reverses the decision of the Commissioner adopting the Appeals Council's decision with respect to the ALJ's findings as to Obryk's state of disability prior to November 22, 2014.  The case is remanded to the Social Security Agency for additional review consistent with this opinion.

_____

Hon. Virginia M. Kendall
United States District Judge

Date: December 20, 2017